Statement of the Case.
MONROE, J.
This is an action on a policy of fire insurance, in which the defendant denies the allegations of the petition, save as especially admitted, denies that there was ever any legal contract of insurance between it and the plaintiff, and alleges .that if it be held that the policy sued on was ever issued to the plaintiff, it was void because of existing insurance in another company.
The policy in question4 purports to have been issued to plaintiff, loss or damage, if any, payable to Mrs. Susie Belle Stokes, “mortgagee (or trustee) as interest may appear,” and in the proof of loss it is stated that no other person than plaintiff had any interest in the property “except as follows: Mrs. Susie Belle Stokes, mortgagee and trustee.” The policy purports to insure plaintiff’s residence for three years, from June 18, 1908, subject to the following (among other) conditions, to wit:
“No concurrent insurance permitted. * * * It is understood and agreed that no additional insurance is permitted, unless the amount allowed is entered in blank space in paragraph next above. * * * This entire policy, unless otherwise provided by agreement, indorsed hereon or added hereto, shall be void if the insured now has, or shall thereafter make or procure, any contract of insurance, whether valid or not, on property covered, in whole or in part, by this policy.”
The facts concerning the writing and issuance of the policy are as follows:
W. B. Singleton was the subagent at Mansfield of the Royal and Commercial Union Insurance Companies, both of England, and about a year prior to June 18, 1908, had insured plaintiff’s residence in the Royal. It appears, however, that the residence was situated in the country, and that plaintiff moved into the town of Mansfield, leaving it “practically” in charge of a caretaker, and that on May 20, 1908, the special agent of the Royal wrote to the subagent, saying that in view of the situation as then existing the company did not feel that it could continue on the risk, and had decided to ask for cancellation of the policy; the writer concluding the letter as follows:
“Requesting that you take up policy and let sanie go to our Atlanta Office, promptly, advising us that you have done so, beg to remain,” etc.
The letter thus quoted was followed on June 8th (as we take it, though it appears in the transcript as July 8th) by another from the second assistant manager of the company, in which the writer refers to the letter previously written, advises the sub-agent that the action thereby taken is confirmed, and again requests that the policy be returned “by early mail.”
Ten days later (on June 18th) the assistant manager again wrote, referring ,to letter of “June 8,” and saying:
“The policy has not yet reached this office and we trust that you will forward same by early mail.”
The subagent, however, did nothing until June ISth, when he made an entry in.his books to the -effect that the policy in the Royal was canceled, charged that company with *381 the unearned premium, wrote a policy for like amount in the Commercial Union, and placed it in his desk, credited that company with the premium thereon, and mailed a daily report to the general agents of the Commercial Union, in which the issuance of the policy was mentioned, and which reached its destination on June 22d. In the meanwhile — on June 21st — the property in question was destroyed by fire, and the suhagent, meeting plaintiff on the street in Mansfield, informed him of that fact, telling him at the same time that the Royal Insurance Company had canceled its policy, and that he (the subagent) had insured the property in the Commercial Union. On plaintiff’s inquiring for the new policy, the subagent told him that it was in his desk in his office, which was in a bank building, and, it being Sunday evening or night, the building was closed. Plaintiff, however, expressed a desire to have the policy, and they went to the office, where it was delivered to him. The subagent then asked for the policy in the Royal, which- was in plaintiff’s possession, and was told that the matter would be attended to in the morning, but on the following day plaintiff took legal advice, and declined to surrender the policy in the Royal, and still retains it.
The evidence shows that the subagent was authorized to keep the plaintiff’s property insured, and that he exercised his own discretion in the selection of the companies in which the insurance was placed. Precisely what was intended to be included in the authority conferred on him is not made clear, and perhaps was not well understood between the parties themselves, nor is the course of business shown with any certainty. We infer from the testimony, and from the fácts that the policy issued by the Royal was and is in the possession of the plaintiff, and that the subagent was only waiting for an opportunity to deliver to him the policy sued on, that it Was his custom to deliver to him all policies taken out for his benefit. Whether it was his custom to inform plaintiff when his policies expired, and have him sign applications for renewals or express his wishes upon the subject, is left in doubt.
Thus the subagent éxamined (in chief) by plaintiff’s counsel, testifies as follows:
“Q. Have you ever, on the expiration of a pcdiey, renewed it without saying anything to him? A. As a policy expired (sic.) I rewrote it. Q. You did that under special request from him? A. Yes, sir. Q. Have you ever renewed in this other company any such policy without special request from him? A. Yes, sir. Q. On what? A. Stock of goods and storehouse at Naborton and on his furniture.”
On the subject of the steps actually taken by him to cancel the policy in the Royal, and of his authority to cancel a policy which had been delivered to plaintiff without notice to him, the subagent says:
On his examination in chief:
“Q. When did you actually cancel in the Royal ? A. On the day that I wrote in the Commercial Union. I was out of town [when] the first letter came, and did not get the letter for a number of days. * * * ”
On his cross-examination:
“Q. Was the Royal policy ever canceled and returned to the company? A. It was canceled, but I failed to see Dr. Nabors, and take it up. Q. You have never taken up the Royal policy, have you? A. No, sir. * * * Q. Did Dr. Nabors or the mortgagee under the policy know anything about the insurance in the Commercial Union? A. I tried to see him, but missed him. * * * Q. Did you give Dr. Nabors five days’1 notice of the cancellation of the policy? A. No, sir. Q. At the time of the fire, then, he had possession of the Royal Insurance 'Company policy? A. Yes, sir. Q. Where was the Commercial Union’s policy at the time of the fire? A. It was in my desk at the First National Bank. Q. It had never been delivered to Dr. Nabors? A. No, sir. Q. When did he first, know that he had a policy written in the Commercial Union? A. The night of the fire (meaning after the fire). Q. The policy is made payable to Susie Belle Stokes? A. Yes, sir. Q. Did she have any notice? A. No, sir. * * * Q. You say that you had some arrangement or request from Dr. Nabors to keep his insurance in force? A. Yes, sir. Q. Did you have authority, as his agent, to cancel a policy without notifying him? A. Yes, sir ; any policy he had. *383 I had such authority. Q. To take it up and rewrite it at any time? A. Yes, sir. Q. At the time the policy was written, you had canceled the other under his instructions as agent? A. Yes, sir; jus.t the force of circumstances kept me from seeing him. Q. You did cancel this policy, and yet, when you notified him, he repudiated it? A. No. sir; he said: T am glad you protected me.’ Q. Why did he not deliver to you the Royal policy? A. I do hot know, except through the advice of his counsel.”
The witness had previously, on his examination in chief, testified as follows:
“Q. Did you have any instructions affecting insurance [from Dr. Nabors], and, if so, what were they? A. The instructions were to keep the property insured. Q. When did he tell you to keep the property insured? A. On several occasions. When he gave me the insurance, he said: ‘Take the business and keep it insured.’ ”
Dr. Nabors in his examination in chief testified that his instructions to Mr. Singleton were to keep his property insured; that the selection of the companies and the renewals were left to him; that he thought that one company or the other was bound to him, and by the .advice of his counsel he held both policies. He .was asked by his counsel, “Q. You never waived any right, either way, in connection with the matter?” to which he replied, “No, sir.” tie was then (after giving some other testimony) asked by the court: “Q. Under your general instructions to Mr. Singleton, could he cancel a policy without notifying you?” And he replied: “I don’t think he could.” And his examination was again resumed by his own counsel as follows:
“Q. So long as he kept you insured, you had no objection to his canceling when your instructions to him were to keep you insured. A. Yes, sir. Q. So, if he canceled one and wrote another that was all right? A. When it was a valid policy.”
It does not appear that Singleton had ever before undertaken to cancel a policy held by plaintiff, whether with or without notice. There is some further testimony in regard to the action taken by the defendant’s general agents, the substance of which is (without going into particulars) that they repudiated the policy sued on as soon as they were apprized of the circumstances under which it was issued, or, say, within a fortnight. “It -is admitted that the amount due Susie Belle Stokes on the mortgage referred to in the policy is $3,000.” There was judgment in the 'district court in favor of the plaintiff for $4,-500 (the full amount of the insurance, as per the policy sued on), of which $3,000 was for the use and benefit of Susie Belle Stokes, with interest from August 18, 1908, until paid, and $500 “as attorney’s fees,” and defendant prosecutes the appeal.
Opinion.
Plaintiff prays for the judgment for $4,500, with damages, interest, and attorney’s fees “for the use and benefit of himself and the said Miss Susie Belle Stokes, mortgage creditor, as her interest may appear”; but Miss Stokes is not a party to the suit, and, in view of the stipulations in her favor in the policy sued on, we apprehend that we should find some difficulty under our law in affirming the judgment appealed from, even if we were satisfied with its correctness in other respects. But we are not so satisfied. The most that can be said of the authority conferred by plaintiff on Singleton is that it authorized the latter to keep plaintiff’s property insured. It does not, however, appear to us that the power to cancel without notice to plaintiff insurance once effected, and evidenced by a policy, delivered to him, necessarily falls within such a mandate. We find the plaintiff testifying that he did not think it did, and showing that he meant what he said by withholding the Royal policy when he was reguested to surrender it (though, according to the theory upon which this suit has been instituted, he was bound to, have considered that policy canceled), and still insisting that he never waived any right with respect to it. On the other hand, whilst Singleton says that he possessed the authority to cancel plaintiff’s insurance without no *385 tice to him, his statement is merely a deduction to the effect that the authority to insure property and keep it insured carries with it the authority to cancel insurance already effected, and of which the assured is informed and holds the evidence, and his testimony is not consistent with his conduct, for, if he considered that he was authorized to cancel the policy in the Royal Insurance Company without notice to plaintiff and although that policy was in plaintiff’s possession, why does he give as a reason, for not obeying between May 26th, and June 18th the instructions of his company to take such action (though he received three letters upon the subject) that he was waiting for an opportunity to give plaintiff notice? There is in evidence an affidavit made by him on June 26th (not referred to in the foregoing statement of the case), in which he says (inter alia):
_ “That about May 27, 1908, he received instructions from A. H. Turner, special agent at New Orleans, to cancel the policy, procure its surrender, and forward to Atlanta, Ga. That upon receipt of said letter affiant was absent from home, and it did not reach him for some days, but, Dr. Nabors being not according to affiant’s recollection in town at the time, he did not give him notice of cancellation, awaiting a convenient opportunity to do so; that on the 3ith of June, 1908, affiant reinsured Dr. Nabors for the same amount in the Commercial Union Insurance Company, entered it up in the books, forwarded a copy to the company, and charged himself with the premium putting the policy away for delivery to Dr. Nabors at the first opportunity. Dr. Nabors being a practicing physician and frequently away from town. That the fire happened on the evening of June 21, 1908, without his having the opportunity to notify Dr. Nabors of the cancellation or the reinsurance, or to deliver the new policy to him. After the fire affiant related the facts to Dr. Nabors as herein above recited, and he submitted the matter to his attorney for advice as to the' course to pursue.”
We have been referred to a number of authorities by the learned , counsel on either side, but none to the effect that a policy of insurance in the possession of the assured can be canceled without notice to him or to some agent authorized by him to accept such notice. In the case of Phœnix Insurance Co. v. State, for Use, etc., 76 Ark. 180, 88 S. W. 917, 6 Am. & Eng. Ann. Cas. 440, on which counsel for plaintiff seem to place some reliance, it appeared that on April 21st the agent of the Greenwich Insurance Company received instructions to cancel a certain policy, and on that day wrote a letter to the assured, informing of that fact, and saying:
“I am canceling the lumber policy and re-writing the same in the Phœnix, of Brooklyn, and shall send you a policy at once.”
He wrote a new policy on April 23d and mailed it to the assured on the same clay, and in doing so repeated certain errors as to the description of the property and the party insured, which made it necessary eventually that the policy should be reformed. The fire occurred on the evening of April 23d (the day on which the new policy was written and mailed). In the meanwhile, on April 22d, the notice of the cancellation and new insurance had reached the assured, and no objection was made thereto then or thereafter, though the president of the company (assured) testified that he intended to have had the errors which had existed in the canceled policy and were repeated in the new one corrected. It was held that the assured was’ entitled to have the new policy, which reached it by mail the day after the fire, reformed and to recover on it; that (to quote from the syllabus in the case):
“The assured may waive a stipulation in a fire insurance policy that it shall not be canceled except upon the giving of a specific notice to him, as the stipulation is for his benefit. Where a fire insurance agent cancels a policy and insures the property in another company, and the assured ratifies the transaction, the company in which the new insurance is effected cannot after a loss has occurred object that the original policy was canceled without due notice to the assured.”
Now, it is true that the learned court by which the case was decided goes on to say that there was an agreement between Amis (president of the company, assured) and Banks (the insurance-agent) that the latter *387 was to keep the property of the former insured. Said the court:
“He constituted Banks his agent for the purpose of selecting the company or companies, and, pursuant to this arrangement, Banks, without notice to Amis, canceled the Greenwich policy, and substituted therefor the Phcenix policy, and mailed it to Amis before the fire occurred. Banks, though the agent of the insurance companies, could be, and was, made the agent of the insured for those purposes.”
In the case cited, therefore, the assured was notified of the cancellation of the existing policy, and the new policy substituted therefor was mailed to him before the fire, whereas in the instant case the assured received no notice until after the fire, and the new policy never until then left the possession of the insurance agent. Beyond that we cannot assent to the application of the doctrine invoked to this case, in which no course of dealing has been shown which would justify the inference that the general authority conferred by plaintiff on the insurance agent to insure his property and keep it insured was intended to include authority to cancel without notice to the assured insurance once effected, and the policy for which had been delivered to him; in which both the assured and the agent, by conduct and testimony, show that the mandate conferred on the latter was not so interpreted by either of them, and in which the assured insists that he has waived no rights quoad the policy said to have been canceled.
We are therefore of opinion that, when the policy here sued on was written, the insurance in the Royal Insurance Company, covering the same interest, had not been canceled, and hence that said policy by its own terms was void ab initio, and that there can be no recovery on it.
It is accordingly ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that plaintiff’s demand be now rejected, and this suit dismissed at his cost.